| DISTRICT COURT, JEFFERSON COUNTY, COLORADO<br>100 Jefferson County Parkway<br>Golden, CO 80401 | |
|---|---|
| **Plaintiff:    JOSEPH HAMILTON**<br><br>v.<br><br>**Defendant:  LIBERTY INSURANCE CORPORATION** | ▲ COURT USE ONLY ▲ |
| Attorney for Plaintiff Joseph Hamilton<br>Galloway Trigg, LLP<br>Robert N. Trigg<br>1873 S. Bellaire St., Ste. 1200<br>Denver, CO 80222<br><br>Phone Number:  303-226-4759<br>Fax Number:  303-226-4774<br>E-mail: bob@gtinjurylaw.com<br>Registration No.: 21020 | Case No:<br>Courtroom:<br>Division: |

DATE FILED: February 27, 2018 4:21 PM
FILING ID: 15ED7D487425A
CASE NUMBER: 2018CV30530

### COMPLAINT & JURY DEMAND

**COMES NOW** Plaintiff, Joseph Hamilton, by and through his attorneys, Galloway Trigg, LLP and for his Complaint against Defendant, Liberty Mutual Insurance Company, states and alleges as follows:

### <u>GENERAL ALLEGATIONS</u>

1.    Plaintiff, Joseph Hamilton ("Hamilton"), at the time of the subject incident, resided at 10555 W. Jewell Ave Apartment 2-103, Lakewood, CO 80232 in Jefferson County.

2.    At all material times hereto, Defendant, Liberty Insurance Corporation ("Liberty") is Illinois Corporation, authorized to be an insurance company in the State of Colorado. Liberty's registered agent is the Division of Insurance, 1560 Broadway, Denver, CO 80202.

3.    At all material times hereto, Directv, LLC is a California Corporation, authorized to do and doing business in the State of Colorado. Directv's principle place of business in Colorado is 161 Inverness Drive West, Fourth Floor, Englewood, Colorado, 80112, County of Arapahoe.



4.    On information and belief, at all material times hereto, Defendant Liberty was the workers' compensation carrier for Directv pursuant to policy number WA761D259859032, and had a contract to provide workers' compensation insurance and benefits to employees of Directv, including Plaintiff Hamilton.

5.    Many of the actions described in this complaint were the subject of a prior lawsuit filed in Jefferson County, 2015CV31822, on October 27, 2015 which Liberty removed to the United States District Court for the District of Colorado, 15-cv-02687. As the underlying workers' compensation was still pending, the parties stipulated the dismissal of that matter, without prejudice, and the parties entered into a tolling agreement.

6.    On or about January 15, 2012, Hamilton was acting within the course and scope of his employment with Directv. He was at a customer's home in the County of Jefferson, State of Colorado. The customer's signal was not providing the required levels, so as a part of his duties and responsibilities of employment, Hamilton had to climb up two stories to the roof where the satellite dish had been installed. The roof was of wood shingle type. With the equipment that Hamilton needed to determine the problems, he went up the east side and down the west side of the home to get to the chimney where the dish was installed. As Hamilton started to go down, he lost his footing on the roof and fell. He used his hands sliding down the roof with as much force as possible to stop, but his bags of tools on his waist prevented his efforts. Hamilton slide down the roof and tried to use his elbow jamming into the roof to stop the sliding. Using the jamming motion of his elbow and his heels hitting the gutters, we was able to prevent the fall to the ground.

7.    Hamilton tried to get up, but had no strength or practical use of his right arm. He pushed himself up with his left arm. Hamilton sat in pain for some time, then tried to return to his duties to complete his job. After switching out some fittings while doing the work one-handed. After his work efforts and some time had passed, Hamilton realized that the use of his left arm was not returning and the pain was not diminishing. Hamilton was not able to return to the ground level without assistance.

8.    At this time, he returned to his ladder, which had been blown down by the wind. Hamilton waited on the roof to try to see a neighbor or passerby for help. A woman across from the house came out and Hamilton yelled to her. She came to his aid with two friends, and they assisted Hamilton to the ground. They also assisted Hamilton to load his equipment on the truck.

9.    Hamilton tried to finish the work inside the house. He contacted his employer to let them know that he was not able to finish the job and report his injuries. Hamilton transported himself to Littleton Porter Hospital for treatment.

10.   Hamilton was treated at the Hospital for a tricep evulsion, a condition where the muscle detaches from the bone without tearing, and pain to his right arm and to his

neck. Directv sent a supervisor to the hospital to fill out the appropriate paperwork to initiate a workers' compensation claim.

11.     That evening, in the hospital, Hamilton underwent a surgery to his right arm to repair the tricep. The surgery was performed by Dr. Robert L. Thomas, of the Center for Orthopedics, 7720 S. Broadway Ste 500, Littleton, CO 80122.

12.     On information and believe, Directv, his employer, reported his injury to their insurance carrier, Liberty, who opened a workers compensation claim.

13.     Despite the claim being opened with Liberty, Liberty did not contact Hamilton to give him a choice of occupational doctors to provide medical care and treatment. Liberty failed to assign an occupational doctor to manage Hamilton's care and treatment.

14.     Without an occupational doctor involved in his case, Hamilton continued care with his orthopedic surgeon, whom after 6 weeks in a cast and brace, referred him to physical therapy.

15.     During physical therapy, Hamilton reported neck pain, and reported this pain to his physical therapist, Jennifer Lustig, PTA. On or about March 15, 2012, she explained that the nerve ran through the surgical area by showing Hamilton an anatomy book. Hamilton, at the time, did not question her explanation.

16.     On May 30, 2012, Dr. Thomas released Hamilton to full duty and told him he could return to work.

17.     After returning to work, Hamilton had continued problems with increasing arm and neck pain. On June 18, 2012, Hamilton went to work complaining of those issues and told his supervisor, Ryan Willis, about the issues. Other staff at Directv instructed Hamilton to return to the doctor.

18.     On June 25, 2012, Hamilton returned to Dr. Thomas and was put on work restrictions that would have allowed him to light duty. On June 28, 2012, Directv sent a letter to Hamilton instructing him that their policy prohibited him from returning to work with light duty restrictions.

19.     Starting in June 2012, Hamilton reported his neck pain to his physical therapists and doctors at every appointment. His physical therapist at Perfomax, Joe Teixeira, sent a fax to Dr. Quick documenting the neck pain in the "C-spine." Starting in July 2012, Hamilton received neck treatment during his physical therapy appointments at Performax.

20.     On July 7, 2012, Dr. Thomas took an x-ray of Hamilton's neck, fining c6-7 narrowing, and send a pre-authorization request for an MRI and EMG to Liberty. Liberty never authorized nor denied this request as required by the Workers'

Compensation Act ("Act") and the related Workers' Compensation Rules of Procedure ("WCRP").

21.     On August 24, 2012, Dr. Thomas referred Hamilton to a doctor specializing in occupational medicine, Dr. Darrel Quick, by finding him in the telephone book. At this point, Liberty still had not given Hamilton a choice of occupational treating doctors as required by the Act. Dr. Thomas follow up notes document "[t]he EMG that was requested still has not been done, his MRI has not been approved, and he lost workers compensation benefits for a period of time." Again, each of these actions or inactions demonstrate Liberty's bad faith handling of the claim.

22.     On the same date, Dr. Quick documented Hamilton's neck issues were found in the x-ray ordered by Dr. Thomas, that the physical therapist found some weakness and neck involvement impacting the right arm. However, the MRI order by Dr. Thomas had been cancelled by Liberty, evidence of their bad faith handling of the claim.

23.     On September 5, 2012, Liberty notified Hamilton through counsel that the MRI request from Dr. Thomas of July 7, 2015 had finally been approved, 60 days after it was requested. This is contrary to the requirements of the Act and evidence of Liberty's bad faith.

24.     On September 18, 2012, the MRI took place documenting Hamilton's disc bulges at C4-5, C5-6, and C6-7. The next day, Hamilton saw Dr. Quick who also documented the C-spine issues. Dr. Quick referred Hamilton to Dr. Al-Tamimi for neck treatment and to Dr. Clinkscales for EMG review.

25.     On October 1, 2012, Hamilton saw Dr. Al-Tamimi who recommended right C6-7 epidural injections and then possibly facet injections for Hamilton and requested authorization from Liberty. Liberty never responded to the request of authorization, further evidence of their bad faith.

26.     On October 2, 2012, Dr. Quick called Liberty to get approval for referral to Dr. Clinkscales. Referral was denied, as further evidence of their bad faith.

27.     On December 14, 2012, Dr. Quick called Liberty again to get approval for referral to Dr. Clinkscales to explain that the reason for the referral was that a hand specialist was needed. Finally, Liberty approved the referral.

28.     Through the remainder of 2012, Liberty failed to authorize the treatment requested by Dr. Al-Tamimi. Again, this is evidence of Liberty's bad faith.

29.     On January 25, 2013, Hamilton saw Dr. Mark J. Hinrichs at SpineOne, who confirmed causation of the neck injury related to this workers' compensation claim and recommended epidural corticosteroid injections. His analysis of the image studies was that Mr. Hamilton from a C4-5 disc bulge with some joint spur

formation, at C5-6 he had a diffuse annular bulge and at C6-7 he also had a diffuse disc bulge.

30.    After seeing Dr. Clinkscales on January 4, 2013, he requested authorization to complete electrodiagnostic studies of the right upper extremity. Liberty denied that request.

31.    On February 11, 2013, Dr. Quick notes that he received the denial of the EMG study and the peer review report on January 23, 2013. He wrote a letter dated January 24, 2013 to Liberty to contest the denial.

32.    Liberty finally did approve EMG studies for Hamilton, and he was authorized by Liberty to make an appointment with Dr. Jill Castro for March 11, 2013. However, that appointment was cancelled and had to be rescheduled for April 8, 2013.

33.    On April 16, 2013, Dr. Quick had received the report and EMG study from Dr. Castro. He came to the professional opinion "that [Hamilton] probably did sustain a cervical injury with progressive radiculopathy." On the same date, Dr. Quick sent a referral to Liberty requesting a transfer of care to Dr. Castro, because it was "complex case with rt cervical radiculopathy and rt ulnar neuropathy 'double crush' Should be managed by a physiatrist." Dr. Quick further ordered a MRI without contrast of the cervical spine. Dr. Castro's exam of that same date notes that Hamilton had limited range-of-motion in his cervical spine with a referral pattern along triceps into 5th digit. She completed an abnormal EMG study, concluding that Hamilton suffered "right C6-7 cervical motor radiculopathy."

34.    Liberty never responded to the request of care to Dr. Castro, but Dr. Castro's office advised Hamilton that they could not take on his case due to case overload. His case was then transferred to Dr. David L. Reinhard for further care. Dr. Reinhard first saw Hamilton on June 13, 2013, who found that Hamilton suffered cervical strain with myofascial pain and dysfunction of the right posterior cervical and splenial musculature, right C7 radiculopathy, and right SI joint and gluteal pain.

35.    In response, Liberty notified Hamilton by letter dated June 28, 2013 that he must attend an independent medical examination (IME) with Dr. Kristin Mason set for August 12, 2013.

36.    Due to Liberty's actions, Dr. Reinhard delayed treatment for Hamilton. In his office visit with Hamilton on July 11, 2013, because he knew of the scheduled IME, Dr. Reinhard held off on physical therapy for Hamilton because of the likelihood that the physical therapy would not be authorized with the pending IME. Without getting prior authorization, Dr. Reinhard completed a test run of trigger point injections of the right scalene complex, but again held off on further trigger point injections due to the pending IME.

37.     On July 23, 2013, Hamilton had to be taken to the emergency room at St. Anthony Hospital when his right leg went out. The hospital records notes his history with the workers' compensation injury and the cervical spine issues.

38.     When Hamilton next saw Dr. Reinhard on August 7, 2013, Dr. Reinhard opined that Hamilton, in addition to other injuries, had "a component of right myogenic thoracic outlet syndrome with compression at the level of the scalene complete." He went on that there was "a cervical stain injury with right-sided myofascial pain and dysfunction, …, right C7 radiculopathy and right low back pain and gluteal pain with a complaint with the leg feeling heavy when [Hamilton] walks."

39.     Dr. Mason, following her IME of Hamilton, Liberty never provided the report to Hamilton or his Counsel. Dr. Reinhart supplied the IME report to Hamilton. While the report did state some opinions about the c-spine diagnosis, importantly, Dr. Mason opined "that the patient does need further diagnostics . . .." She did recommend further EMG studies.

40.     On August 16, 2013, instead of approve additional treatment directed at solving Hamilton's C-spine injury, Liberty approved a third EMG study and sent Hamilton for "psychological evaluation for chronic cervical and right elbow pain."

41.     On October 4, 2013, Liberty filed a workers' compensation application for hearing on the issues of compensability, and medical benefits being reasonably necessary and related to the injury. This caused the authorized treating physicians to stop all treatment. As Dr. Reinhard said in the November 27, 2013 notes, "[w]e are not much at this point just because [Hamilton] is in the pipeline to have a hearing and we are not getting anything authorized at this point." Liberty's actions again delayed Hamilton's reasonable, necessary and appropriate care to his cervical spine injury.

42.     On information and belief, after the hearing application through early 2014, Counsel for Liberty became the source for approving and not approving reasonable and necessary medical care. This is contrary to accepted practice in handling workers' compensation claims

43.     On information and belief, Counsel for Liberty would also call and email Hamilton's authorized treating physicians to inappropriately dictate medical care. This is further evidence of Liberty's bad faith and contrary to case law that prohibits such actions by a workers' compensation carrier

44.     On January 15, 2014, Dr. Reinhard recognized that Hamilton needed "physical therapy for the cervical and lumbar spine," and that he was in no condition to return to full duty. He stated, "[Hamilton] is not ready to return to full duty at all."

45.     Rather than get Hamilton to return to appropriate care and treatment, Liberty Set a mandatory appointment for him to see the psychologist, Dr. Kenneally, for

February 18, 2014. Meanwhile, on February 12, 2014, Dr. Reinhard continued to document Hamilton's need for further care for his C6-7 dis protrusion and c4-5 canal stenosis, recommending epidural blocks and a more current MRI.   On February 24, 2015, Liberty denied the request for the MRI, even though it was requested by Hamilton's authorized treating doctor, and even recommended by Liberty's designated IME doctor, Dr. Mason.

46.     Dr. Mason supplemented her IME report on February 24, 2014, recommending that Hamilton be given the opportunity to have C6-7 epidural steroid injections. Accordingly, Dr. Reinhard did request a right C6-7 transforminal epidural corticosteroid injection, which was completed by Dr. Berry Ogin on April 3, 2014.

47.     On June 12, 2014, Liberty, in further attempt to not treat Hamilton for his workers' compensation injuries, next requested a procedure in workers' compensation for a 24-month Division Independent Medical Exam (DIME).

48.     Dr. Reinhard requested further epidural injections, this time bilaterally, on June 17, 2014. On June 30, 2014, Liberty denied the request for these injections, causing further delay in treatment and delay in allowing Hamilton to recover from his injuries and get back to his life and work.

49.     On July 8, 2014, A Pre-Hearing Administrative Law Judge ruled that Liberty had not met the criteria to require Hamilton to attend a 24-month DIME. The next day, Liberty asked their IME doctor to supplement her IME report, wherein she stated that she "did not see a role for further interventional spine care for [Hamilton]," and that Hamilton "would be an exceptionally poor candidate for surgical treatment based upon his psychologic profile," when Hamilton had two visits with the psychologist whom made no opinions that Hamilton had a poor profile for surgery.

50.     Even though Liberty had requested a hearing about further care and treatment for Hamilton, Dr. Ogin was allowed to do bilateral epidural injections on July 10, 2014. The Administrative Law Courts set the matter for hearing on October 2, 2014.

51.     While the hearing was pending, Dr. Michael J. Rauzzino, the authorized treating physician selected by Liberty for further spine treatment requested further spinal injections and an updated MRI on September 8, 2014. Liberty did approve those requests on September 18, 2014 and September 19, 2014.

52.     After finally meeting the requirements for a 24-month DIME for Hamilton, Liberty set a DIME appointment with Dr. Jade Dillon for October 28, 2014. However, Liberty failed to provide Dr. Dillon with Hamilton's records as required by workers' compensation law, so that appointment had to be cancelled.

53.     On November 6, 2014, Dr. Reinhard saw Hamilton after his third series of bilateral C6-7 epidural blocks, all with "ongoing benefit." Accordingly, Dr. Reinhard referred Hamilton back to Dr. Ogin for additional epidural injections. However,

Liberty's utilization review doctor, Dr. William M. Basow, found that the request was an "adverse determination" and that surgical intervention was appropriate. Liberty therefore denied the request for further injections, and Hamilton was finally referred for surgical evaluation, just short of three years after his workers compensation injury.

54.     On December 22, 2014, Dr. Reinhard referred Hamilton back to Dr. Rauzzino to see if he was an appropriate cervical spine surgery candidate. On January 26, 2015, Dr. Rauzzino "issued a request for surgery to be done as soon as possible." The surgery still had not been approved on February 2, 2015, when Hamilton again saw Dr. Reinhard, who warned Hamilton that his recovery after surgery would be long because it "takes some time for the nerves to recover."

55.     On February 6, 2015, Liberty did approve Hamilton for "anterior cervical discectomy with decompression of spinal cord and/or nerve root(s), including osteophytectomy and fusion at C6-C7 for the cervical spine. . .." Liberty's own findings approving the surgery stated that diagnosis of cervalgia (723.1) resulted from when the patient slipped while working a roof and slid down the roof on his back," which is the workers' compensation injury of January 15, 2012 subject of this claim.

56.     On February 20, 2015, Dr. Rauzzino performed the cervical spine surgery related to Hamilton's workers' compensation injury. Dr. Rauzzino did find that there were "other levels of degeneration through the spine, but these were not to be treated at this time as the stenosis was worse at [C]6-7."

57.     In the spring of 2015, Hamilton continued care to recover from the spinal surgery and then started again with medically recommended physical therapy to try to finally recover from his worker's compensation injury, now over three-years post injury.

58.     After the third attempt to set a DIME due to Liberty not complying with various requirement for completing the 24-month DIME, Dr. Jade Dillon did see Hamilton for a DIME appointment on March 31, 2015. Dr. Dillon opined that Hamilton was not at maximum medical improvement (MMI) from his workers' compensation injuries and that he currently had a 37% whole-person impairment.

59.     During Hamilton's follow up care visit with Dr. Reinhard, the doctor agreed with Dr. Dillon that Hamilton was not at MMI, that Hamilton needed further physical therapy, and although further physical therapy had been requested by the surgeon, Dr. Rauzzino, the physical therapy had not been approved by Liberty. Dr. Rauzzino also confirmed the need for physical therapy for Hamilton in his office notes of June 22, 2015.

60.     On May 6, 2015, in on-going and continued bad faith in handling this workers' compensation claim, and despite all the evidence to the contrary, Liberty filed an

administrative law courts application for hearing, for the purpose of "[o]vercoming the DIME report of J.E. Dillon, M.D., dated 3/31/15, as to relatedness of c-spine, MMI and impairment rating."

61. With the hearing application again pending in the matter, the authorized treating physicians again stopped care and determined that further requests for treatment would be denied.

62. As a direct and proximate result of Liberty's bad-faith handling of the subject workers' compensation claim, Hamilton sustained serious and permanent injury including, but not limited to injury to the spine and pain, numbness, headaches, and psychological and/or emotional injury. Hamilton sustained and endured prolonged chronic pain, injury to the nervous and musculoskeletal system, all of which injuries have resulted in limitations of movement, pain and suffering, loss of enjoyment of life, and have required and will continue to require into the future: medical and other health care treatment.

63. As a further direct and proximate result of Liberty's bad faith, Hamilton has incurred in the past and will continue to incur in the future: medical and other health care and rehabilitation expenses related to his injuries; has suffered and will continue to suffer physical pain and mental anguish, loss of enjoyment of life, loss of home services, loss of income, loss of time and economic loss; and has suffered permanent physical impairment and disability to his damage in an amount to be determined at trial.

64. Jurisdiction in this case is proper pursuant to C.R.S. §13-1-124.

65. Venue is proper pursuant to COLO. R. CIV. P. 98(c).


## FIRST CLAIM FOR RELIEF
### (THIRD-PARTY BAD FAITH BREACH OF INSURANCE CONTRACT)

66. Plaintiff incorporates by reference as though fully set forth herein, all preceding allegations in this Complaint.

67. At all times pertinent hereto, Defendant Liberty acted unreasonably in failing to approve care and treatment for Hamilton's spine injuries related to the workers' compensation injury of January 15, 2015, failed to actively manage the reasonable and necessary care related to the spinal cord injuries, and even after approving and agreeing that the spinal cord surgery was related and necessary, filed a hearing application to deny the relatedness of the care and treatment.

68. As a direct and proximate result of Defendant Liberty's conduct, Plaintiff Hamilton suffered injuries, damages and losses as set forth in this Complaint and has suffered or will suffer damages as follows:

a. Plaintiff has suffered and will continue to suffer physical, mental and emotional injury;

b. Plaintiff has suffered and will continue to suffer chronic and permanent physical, mental and emotional pain and suffering;

c. Plaintiff has been required to and will be required to endure health care and other ancillary providers for treatment and rehabilitation and has incurred and will continue to endure prolonged health care and rehabilitation treatment and care;

d. Plaintiff has suffered and will continue to suffer permanent physical impairment;

e. Plaintiff has suffered and will continue to suffer a loss of income, fringe benefits, and other economic opportunities and benefits;

f. Plaintiff has suffered and will continue to suffer a loss of earning capacity;

g. Plaintiff has suffered and will continue to suffer from inconvenience and a loss of enjoyment of life;

h. Plaintiff has suffered and will suffer a probable increase of harm and disease which is permanent;

i. Plaintiff has suffered and will continue to suffer loss of household and essential services;

j. Plaintiff has suffered and will continue to suffer other compensatory damages.

69. All of the above described damages have occurred or will occur in the future. The amount of damages is presently unknown, but is in excess of the minimum jurisdiction of this Court. When a precise amount of damages is known, it will be established by way of amendment to the pleadings or according to proof at the time of trial.

WHEREFORE, Plaintiff, Joseph Hamilton, requests the Court enter judgment in his favor and against Defendant and award him compensatory, proximate, incidental and consequential damages in an amount to be determined at trial, plus pre and post judgment interest pursuant to C.R.S. §13-21-101 et seq., plus costs, expert witness fees, attorney fees allowed by law if there be any frivolous or groundless denial or affirmative defense, and such other and further relief that the Court may deem just and proper.

**PLAINTIFF REQUESTS A TRIAL TO A JURY OF SIX ON ALL ISSUES.**

Dated this 27th day of February, 2018.

GALLOWAY TRIGG, LLP

*/s/Robert N. Trigg*_____
Robert N. Trigg, #21020
1873 S. Bellaire St., Ste. 1200
Denver, CO 80222
(303) 226-4759
Fax: (303) 226-4774
bob@gtinjurylaw.com

*/S/ Denotes electronic signature. Original signature on file and available for inspection pursuant to C.R.C.P. 121 § 1-26(9).*

ATTORNEYS FOR PLAINTIFF

PLAINTIFF'S ADDRESS:
**1613 Allison St #4**
**Lakewood CO 80214**

## CERTIFICATE OF FILING & SERVICE

The foregoing Complaint & Jury Demand and Civil Cover Sheet and were electronically filed via ICESS this 27th day of February, 2018.

*/s/ Robert N. Trigg*_____

*/S/ Denotes electronic signature. Original signature on file and available for inspection pursuant to C.R.C.P. 121 § 1-26(9).*